## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## FOURTH NATIONAL BANK OF MONTGOMERY, ALABAMA V. BRAGG.

### March 18, 1920.

1. BILL OF LADING—*Assignment—Title to Goods.*—A bona fide assignment or transfer of a bill of lading vests in the assignee or transferee the title of the shipper to the goods covered by the bill.

2. BILL OF LADING—*Assignment—Title of Bank Paying Accompanying Draft.*—Where a bank takes an assignment of a bill of lading and pays the accompanying draft of the shipper for the value of the goods, the bank thereby becomes a bona fide holder, and no attachable interest in the goods or proceeds thereof remains in the shipper.

3. BILL OF LADING—*Deposit of Draft Accompanied by Bill of Lading as Cash—Title of Bank.*—Where a draft with a bill of lading attached was deposited in a bank and the item was not entered for collection, but was treated as cash, and placed to the depositor's credit, subject to his check, the bank becomes the owner of the draft by purchase, and accordingly the owner of the bill of lading and its proceeds under the law both of Virginia and Alabama. The relation of debtor and creditor is established at once between the depositor and the bank.

4. BANKS AND BANKING—*Deposit of Paper as Cash—Title of Bank.*—The presumption that a bank becomes the owner of paper deposited as cash is prima facie only, and may be rebutted by proof showing that the parties contemplated a different relationship at the time of the deposit. But when nothing else appears than the mere fact of the deposit and the credit thereof as cash, which the depositor may withdraw at will, the law implies and establishes between the bank and the depositor the relationship of vendor and purchaser as to the paper, and of creditor and debtor as to the proceeds thereof.

5. BANKS AND BANKING—*Deposit of Bill or Check—Title of Bank—Bank Charging Dishonored Paper to Depositor.*—A deposit in a bank of a bill, check, or other evidence of debt in the ordinary

course of business, whereby the depositor receives a credit against which he may draw, operates to transfer the title to the bank, in the absence of usage, custom, or any oral or other agreement that the effect of the transaction shall be otherwise, etc. This is the rule, although the bank has the right to charge dishonored paper to the depositor, instead of proceeding against the maker.

6. CONFLICT OF LAWS—*Drafts.*—Where a draft is drawn by a party in Alabama upon one in Virginia and deposited by the drawer in a bank in Alabama, the contract between the drawer and the bank must be interpreted, and the title of the bank to the proceeds accordingly determined, by the law of the State of Alabama, where no question as to the right or liability of the drawee is involved.

7. BILLS, NOTES AND CHECKS—*Conflict of Laws—Deposit of Draft.*—As between the drawer and the holder of a draft, the law of the place in which it was made determines the question of title to the proceeds, unless it appears that the parties had in contemplation the law of some other place as the proper law.

8. FOREIGN LAWS—*Questions of Law or Fact.*—The question of what is the law of another State is one of fact, but the interpretation of a foreign statute or judicial decision is a question of law.

9. FOREIGN LAWS—*Foreign Decisions not Introduced in Evidence.*—While the decision in an Alabama case not introduced at the trial may not be resorted to as evidence of the Alabama law, it may be looked to as an authoritative repository of legal principles for guidance in the interpretation of Alabama decisions which were introduced in evidence.

10. BANKS AND BANKING—*Deposit as Cash—Recourse on Depositor.*—The title of a bank to a draft deposited with it as cash is not affected by the fact that the bank would always have recourse on the depositor if the drawee failed to pay the draft.

11. BANKS AND BANKING—*Deposit of Draft as Cash—Restricted Indorsement by Bank.*—The title of a bank to a draft deposited with it as cash is not affected by the fact that the bank's indorsement of the draft stated that the bank indorsed it solely for the purpose of collecting it, and did not guarantee the title, possession, delivery, quantity, quality or other condition of the goods mentioned in the attached bill of lading.

12. APPEAL AND ERROR—*Judgment by Appellate Court.*—Where the facts are fully before the court, and there is no reason to suppose that upon another trial any new or different evidence might be introduced which ought to affect the result, the

Supreme Court of Appeals, under section 6365 of the Code of 1919, will render judgment for the plaintiff in error, where in its opinion such judgment is proper.

Error to a judgment of the Corcuit Court of city of Richmond, in an action of attachment in which the plaintiff in error intervened. Judgment for plaintiff. Intervener assigns error.

*Reversed.*

The opinion states the case.

*George Bryan,* for the plaintiff in error.

*A..H. Sands,* for the defendant in error.

Kelly, P., delivered the opinion of the court.

On December 7, 1917, W. F. Covington, trading as Covington Manufacturing Company, at Montgomery, Alabama, drew a sight draft for $1,740.21 on Manchester Mills, Richmond, Virginia, and attached thereto a bill of lading for a shipment of corn. This draft, with the bill of lading attached, was deposited by Covington in the Fourth National Bank of Montgomery, where he had a regular account. The item was not entered for collection, but was treated as cash, and along with other cash items deposited at the same time (the total deposit being $1,875.23) was placed immediately to Covington's credit and subject to his check. His account at the bank continued thereafter in the usual course of such accounts until some time in April, 1918, when it became overdrawn and was discontinued. In the meantime, however, although the account had been active and Covington's balance at times substantial, the balance had fluctuated, and shortly after the deposit of the draft above mentioned, to-wit, on December

7

11, 1917, the balance was reduced to about $600, on December 15 to about $300, and on January 14, 1918, to less than $25. It thus appears that to all substantial intents and purposes the full amount placed to his credit on account of the draft was paid out upon his checks.

It was the custom and usage of the banks in Montgomery to take out-of-town drafts as such, giving the depositor credit therefor and allowing him to check upon the amount at once; but in such cases the deposit had first to be approved by some officer of the bank authorized for that purpose. In this case the deposit appears to have been approved by the cashier of the bank, an officer having such authority. It was always understood that if such drafts were not paid by the drawee, they would be charged back, or the depositor otherwise held ultimately liable therefor.

The draft was forwarded by the bank to its correspondent, The American National Bank, in Richmond, by which it was presented, and after the deduction of a small amount which was authorized by the bank, with the approval of Covington, the same was paid on February 2, 1918, there having been some delay and negotiations with reference thereto between its presentation and payment.

The day the draft was paid to the American National Bank, the proceeds were attached by W. G. Bragg for the satisfaction of an unliquidated demand against Covington, which he was then asserting in a foreign attachment proceeding in the Circuit Court of the city of Richmond. The Fourth National Bank intervened by petition, claiming to have been the holder in due course of the draft, and as such the owner of the proceeds of the bill of lading. The case was tried by the court and a jury. There was a verdict and judgment in favor of Bragg, and the case is here upon a writ of error.

[1, 2] It is a platitude of the law merchant that a *bona fide* assignment or transfer of a bill of lading vests

in the assignee or transferee the title of the shipper to
the goods covered by the bill.   Smith's Mercantile Law,
page 378; 4 R. C. L. p. 32, and cases cited in Note 19.
Equally familiar and well settled is the proposition that
where a bank takes an assignment of a bill of lading and
pays the accompanying draft of the shipper for the value
of the goods, the bank thereby becomes a *bona fide* holder,
and no attachable interest in the goods or proceeds thereof
remains in the shipper.   *Buckeye National Bank* v. *Huff,*
114 Va. 1, 7; 75 S. E. 769; *Walsh, Boyle & Co.* v. *National
Bank,* 228 Ill. 446, 81 N. E. 1067

[3]   The important question in this and all similar
cases is whether it can be said that the draft with the
bill of lading attached has been taken by the bank in such
way as to constitute an assignment of and payment for the
bill.   The answer here depends upon the manner in which
the draft, as the medium both of the assignment of and
the payment for the bill, was deposited in and handled
by the bank; and, the case thus presents the very common
but very important and not altogether simple question as
to the circumstances under which a bank, in taking from
a customer a check or draft in the usual course of the
banking business, will become the owner of such check or
draft, as distinguished from a mere collecting agent for the
customer.   The authorities upon the question are multi-
tudinous and not altogether harmonious, but they may be
safely said to clearly preponderate in favor of the view
that under the facts of this case the bank became the
owner of the draft by purchase, and accordingly the owner
of the bill of lading and its proceeds.

Some general discussion of the authorities seems desira-
ble, since the question, precisely as it arises here, can
hardly be said to have been definitely settled either in this
State or in the State of Alabama, where the draft was
drawn and deposited.

In 3 Ruling Case Law, page 524, section 152, it is said: When a check or other commercial paper is deposited in bank endorsed for collection, or where there is a definite understanding that such is the purpose of the parties at the time of deposit, there is no question that the title to the paper remains in the depositor. So, checks deposited as checks do not give rise to the relation of debtor and creditor, and the title to them remains in the depositor, the bank merely acting as an agent of the depositor for the purpose of collection. If, on the other hand, there is a definite understanding at the time of the deposit that such paper is deposited as cash, it is clear that the title passes to the bank. But where a check endorsed in blank is deposited without any definite understanding as to the way it is to be treated, but is credited by the bank to the depositor as cash, and is so entered upon the depositor's. pass book, the question frequently arises whether the title to the check passes immediately to the bank or remains in the depositor. *Prima facia*, according to the weight of authority, the passing to the credit of the depositor of a check bearing an endorsement not indicating that it was deposited for collection merely, passes the title to the bank," citing numerous cases.

In *Burton* v. *United States*, 196 U. S. 283, 25 Sup. Ct. 243, 49 L.Ed. 482, the following observations, pertinent here,. were made by Mr. Justice Peckham, who delivered the opinion of the court, concurred in by all of the justices except Mr. Justice Harlan: "There was no oral or special agreement made between the defendant and the bank at the time when any one of the checks, was deposited and credit given for the amount thereof. The defendant had an account with the bank, took the check when it arrived, went to the bank, endorsed the check, which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other

words, it was the ordinary case of the transfer or sale of the check by the defendant and the purchase of it by the bank, and upon its delivery to the bank under the circumstances stated the title to the check passed to the bank and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of collecting the amount of the check from the trust company upon which it was drawn. From the time of the delivery of the check by the defendant to the bank it became the owner of the check; it could have torn it up or thrown it in the fire or made any other use or disposition of it which it chose and no right of the defendant would have been infringed. The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of a bank when a check was not paid of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the endorser of the check and nothing more. There was nothing whatever in the evidence to show any agreement or understanding as to the effect of the transaction between the parties—the defendant and the bank— making it other than such as the law would imply from the facts already stated. The forwarding of the check 'for collection,' as stated by Mr. Brice, was not a collection for defendant by the bank as his agent. It was sent forward to be paid and the Riggs Bank was its owner when sent."

The case of *Ditch* v. *Western National Bank*, 79 Md. 192, 29 Atl. 72, 138, 47 Am. St. Rep. 375. 23 L. R. A. 164, is instructive and much in point. Shyrock & Company drew their check on the Third National Bank of Baltimore, payable to the order of one Reese, who endorsed it to the order of Ditch & Brother, and the latter in turn endorsed it "for deposit to the credit of" themselves. There was no special arrangement made between the depositor and the bank with ref-

erence to checking on the deposit, but the evidence shows that the effect of the transaction was to give to Ditch & Brother a credit with the bank and the unconditional right to check upon it. The court said in the course of the opinion: "If Nicholson & Sons (the bankers) had paid to Ditch & Brother the full amount of the check in coin or currency when it was delivered to them, it is supposed that there would have been no question about the nature and effect of the transaction. But they gave Ditch & Brother what was preferred to the coin or currency; they gave them the unconditional right to get the coin or currency at any time they might see fit to call for it; thus relieving them from the trouble and risk attending the care and custody of it. Now, it is extremely difficult to see on what principle or by what process Ditch & Brother could retain any interest in this check after they had delivered it to a blank endorsee and had received full and valuable consideration for it. It will not be alleged by anyone that the banker did not give a consideration, valuable in the eye of the law, and sufficient to maintain the transfer of the check, when he made an absolute and unconditional contract with the depositor to pay his checks to the amount of the deposit."

In Freeman's note to *Ditch v. Bank, supra,* 47 Am. St. Rep. 389, it is said: "The law, therefore, is that checks, drafts or other evidences of debt received by a bank in good faith as deposits, and credited as so much money, become the property of the bank, and it becomes legally liable to the depositor as for so much money deposited as of the date of the credit (citing a multitude of cases). And our understanding is that this rule is not confined to cases where checks are drawn upon the same bank which credits them as cash, but that a bank which receives and credits as cash checks drawn upon some other bank is entitled to the same rights and incurs the same liability as

if the checks were drawn upon itself and so credited. (Citing cases.)   The transaction is, in legal effect, a transfer to the bank upon an implied contract on the part of the latter to repay the amount of the deposit upon the checks of the depositor."

Again, in a note in 86 Am. St. Rep. 781, the same learned author says: "We have already seen that a general deposit of money with a banker transfers the title to such money to the bank and creates the relation of debtor and creditor between the banker and the depositor.   The same rule applies with equal force to checks or drafts deposited by a customer, and it is established beyond doubt that whenever paper is deposited and is regarded by both parties as amounting to so much cash, the title to such paper passes immediately and the relation of debtor and creditor arises and the transaction is equivalent to a purchase of the check or draft by the banker and he becomes responsible to the depositor for the amount thereof."   (Citing many cases.)

[4]   In a note to the Virginia case of *Fayette National Bank* v. *Summers*, 105 Va. 689, 54 S. E. 862, 7 L. R. A. (N. S.) 694, it is shown that, by the clear weight of authority, where a check or draft is taken for deposit and treated as cash, as distinguished from a deposit for collection, the relation of debtor and creditor is established at once between the depositor and the bank, the bank becoming the owner of the check or draft and the depositor the owner of the proceeds placed to his credit.   To be sure, the general rule is that this result is *prima facie* only, and may be rebutted by proof showing that the parties contemplated a different relationship at the time of the deposit. But when nothing else appears than the mere fact of the deposit and the credit thereof as cash, which the depositor may withdraw at will, the law implies and establishes between the bank and the depositor the relationship of vendor and purchaser as to the paper and of creditor and debtor as to the proceeds thereof.

[5] In 2 Michie on Banks and Banking, page 914, it is said: "A deposit in a bank of a bill, check or other evidence of debt in the ordinary course of business, whereby the depositor receives a credit against which he may draw, operates to transfer the title to the bank in the absence of usage, custom or any oral or other agreement that the effect of the transaction shall be otherwise, etc." and the same author says, at page 917, that "this is the rule although the bank has the right to charge dishonored paper to the depositor instead of proceeding against the maker." See also to same effect 2 Morse on Banks & Banking (5th ed.), sec. 577, and cases ·cited.

The Virginia cases, so far as they have gone, appear to be substantially in accord with the result of the authorities as indicated above.

In *Fayette National Bank* v. *Summers,* the court approved the following instructions:

"The court instructs the jury that if they shall believe from the evidence that the plaintiff bank received the check which is the subject of this suit as a deposit to be treated as cash, and that such was the intention of the parties at the time the check was received and deposited, then title to said check passed to the bank at that time. But if the jury shall believe from the evidence that the parties intended that the bank should not receive said check as cash, but only as an agent for collection, then title to said check did not vest in the bank at the time of the deposit.

"The court further tells the jury the question as to whether the parties intended the check when deposited to be treated as cash or merely for collection is one of fact for the jury under all the facts and circumstances proven in the case relating thereto and throwing light thereon."

It is true the court in that case thought there was enough evidence to carry to the jury the question of the intention of the parties, or, to express it differently, enough

evidence to justify the jury finding that the *prima facie* presumption, to which we have referred, was rebutted; but the importance of the case in its application to the one in hand is that it distinctly recognizes the practically universal doctrine that a deposit of a check or draft which the parties intend to be treated as cash, passes the title of the check or draft to the bank.

It is interesting and pertinent to note that in this case of *Bank* v. *Summers,* Judge Keith cited and quoted with approval the Alabama case of *National Bank* v. *Miller,* 37 Ala. 173, 54 Am. St. Rep. 50, which likewise expressly recognized the same doctrine.

The result of the decision of this court in *Bank* v. *Summers,* and of the Alabama case of *Bank* v. *Miller,* undoubtedly is that the question is one of intention of the parties, and both of these cases, as well as the other cases in Virginia and Alabama to which our attention has been directed, show a strong tendency to leave the question to the jury wherever there is any evidence to rebut the *prima facie* presumption that a cash deposit is intended to vest in the bank the title to the instrument pursuant to which the cash deposit is made. None of the cases in either State, however, go far enough, as we construe them, to conflict with the general doctrine, overwhelmingly established by authority elsewhere, that the deposit of a check or draft as cash, in the absence of other evidence, passes title in the check or draft to the bank as a matter of law.

In *Greensburg National Bank* v. *Syer,* 113 Va. 53, 73 S. E. 438, the same general rule is recognized. It was held there that "if, when a draft is deposited in bank, it is the intention of both the depositor and the bank that it shall be treated as cash, the title thereto passes to the bank, but that if it was the intention of the parties that it should not be received as cash but only for collection, then the title does not pass to the bank."

8

The case of *Lynchburg Milling Co.* v. *National Exchange Bank,* 109 Va. 639, 64 S. E. 980, was a case in which there was a contest between the payee of a bill of exchange and the drawer thereof, or a creditor of the drawer, over the proceeds of the draft. The exact question involved in the case in hand did not arise in that case, but a judgment in favor of the bank was sustained, and Judge Whittle in the course of his opinion said: "The Negotiable Instruments Act (Virginia Code 1904), section 2841-a, (24), declares that every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration and every person whose signature appears thereon to have become a party thereto for value."

In *Miller* v. *Norton,* 114 Va. 609, 77 S. E. 452, the substance of the opinion, in so far as directly applicable to this case, is accurately stated by the reporter as follows: "Where there is a general deposit of money in a bank, the title to and beneficial ownership of the money is vested in the bank, and the relation between it and the depositor is that of debtor and creditor. So likewise, where a check drawn on a particular bank is presented to that bank for general deposit and the bank gives the depositor credit therefor, and relationship between the bank and the depositor is that of debtor and creditor, since the giving of credit under such circumstances is practically and legally the same as if the bank had paid the money to the depositor and has received it again on deposit.

"Where a check on one bank is deposited in another for collection, the ownership of the check is not transferred to the receiving bank, but it is the agent of the depositor until collection is made, and not until then does it become the debtor of the depositor. But if the check is deposited in exchange for credit given the depositor, then the transaction is in effect a sale of the check to the bank, and it becomes the beneficial owner of the check and the debtor of the depositor."

In the course of the opinion in this case of *Miller* v. *Norton,* it is said: "In this country, though the rule seems to be different in England, it is settled that the mere giving of credit to a depositor's account of a check does not constitute the bank a holder for value, but in order to have that effect the credit must be drawn upon." If this expression had to be taken at its face value, without the qualification appearing in other parts of the opinion, the facts of the instant case would fully measure up to it, because the deposit was not only checked upon but practically exhausted by the checks of the depositor. It is manifest, however, from the opinion as a whole that the court intended to decide that wherever the credit given for the deposit carried with it the right of the depositor to draw checks thereon and the obligation of the bank to pay them, the title to the paper in exchange for which the credit was given passed to the bank. The last sentence quoted above from the syllabus is taken literally from the body of the opinion, is supported by the authorities cited therein, as well as by the great weight of authority generally, and is a correct statement of the law as we understand it to be declared in that opinion, and as we intend to declare it here.

In *Buckeye National Bank* v. *Huff, supra,* a case involving a draft with bill of lading attached, the effect of the decision pertinent here is correctly stated by the syllabus as follows:

"Where a bank takes, by endorsement, a bill of lading and pays a draft of the shipper for the value of the goods, the bank becomes the owner of the goods covered by the bill of lading until the draft is paid, and this is true, although the transfer be not to give the permanent ownership, but to furnish security for the advance of money or discount of commercial paper. After such transfer no attachable interest in the goods remains in the shipper.

"The law presumes that the transfer of a bill of lading, with draft attached, is for a valuable consideration, and the burden of proving the contrary is upon him who denies it.

"The assignment of a bill of lading for goods operates to transfer to the holder the legal title to the goods and the possession thereof as effectually as if there were a physical delivery of the goods to the purchaser. After such assignment, the levy of an attachment on the goods for a debt due by the shipper is a conversion of the goods, for which the holder of the bill of lading may bring either an action for damages resulting from the wrongful seizure, or an action of trover, and in either case the measure of damages is practically the same. The holder of the bill of lading is not limited to a recovery of the value of the goods sold in the attachment proceedings and the costs incident to the sale. The conversion is complete, and in such case the injury suffered is, as a rule, the value of the property converted, and the holder of the bill of lading, with a draft attached for the price of the goods, is entitled to recover at least the amount of the draft."

[6, 7] It is contended, however, by the defendant in error, 'and so held by the lower court, that the contract between Covington and the bank must be interpreted, and the title of the bank to the proceeds accordingly determined, by the law of the State of Alabama. This proposition appears to be entirely sound and well settled. No question as to the right or liability of the drawee is involved. As between the drawee and the holder of the draft, the law of the place in which it was made determines the question of title to the proceeds, unless it appears that the parties had in contemplation the law of some other place as the proper law. As stated in Biglow on Bills and Notes, (2d ed.), page 281, "that question, it is clear, must be decided by the law of the State or country in which the bill was drawn, unless it appears that the law of some other country

was contemplated." See also to the same effect *Amsinck* v. *Rogers,* 189 N. Y. 252, 82 N. E. 134, 12 L. R. A. (N. S.) 875, 121 Am. St. Rep. 858, 12 Ann. Cas. 450; *Brownell* v. *Freese,* 35 N. J. L. 285, 10 Am. Rep. 239; *Briggs* v. *Latham,* 36 Kan. 255, 13 Pac. 393, 59 Am. Rep. 546; *Hunt* v. *Standart* 15 Ind. 33, 77 Am. Dec. 79; 3 R. C. L., p. 1142, sec. 357; 5 R. C. L. 964, 965, sec. 47.

As evidence of the law of the State of Alabama, the official reports of the cases of *Josiah Morris* v. *Alabama Carbon Co.,* 139 Ala. 620, 36 So. 764, and *Stone River National Bank* v. *Lerman Milling Co.,* 9 Ala. App. 322, 63 So. 776, were introduced and used under a stipulation of counsel.

A consideration of these cases leads us to the conclusion, foreshadowed in what has already been said, that the law of Alabama is in accord with the law of Virginia and generally elsewhere. Both of the Alabama cases relied on clearly recognize the controlling distinction between a deposit for collection and an unqualified and unconditional deposit for credit treated as cash. In the one case, the title remains in the depositor, and in the other, it passes to the bank.

The first case relied upon, *Morris* v. *Alabama Carbon Co.,* gives rise to no difficulty whatever because the report of the case shows that the item involved was a draft drawn in favor of the cashier of a bank merely for the purpose of enabling the collector of the bank to apply the proceeds thereof to the drawer's credit, and was enclosed in a letter to the cashier requesting him to collect the draft and place it to his credit. The decision plainly draws the distinction between a deposit for collection and a purchase by the bank, and shows that the bank "took the paper not as a purchaser but in the capacity of a collecting agent for the forwarding bank."

The case of *Stone River National Bank* v. *Lerman Mil-*

*ling Co.,* the other case relied upon by the defendant in error, is in its facts more nearly like the case at bar, and goes further than the former case in sustaining the contention that under the Alabama law the Fourth National Bank did not take title to the draft, but merely took it as the collecting agent of Covington. It seems pertinent to observe that this decision was rendered by an intermediate and not by the Supreme Court of Alabama. Furthermore, it is apparent that the opinion throughout proceeded upon the assumption that the bank, as a matter of fact, received the deposit *for collection,* and accepted it "merely as the agent of the defendants for collection," and "the claimant was not a purchaser of the draft and had no interest whatever in it." The court further says: "The case would be different if claimant bank had purchased the draft, which would have happened if it had at the time actually paid the defendants the cash, or other equivalent consideration, for it, or had, by an agreement with defendants, credited the amount of it on a debt owed claimant by defendants. In any such case, the claimant would have been a purchaser of the draft and could not rightfully be deprived of its proceeds by another creditor of the defendants."

In the case at bar, counsel for defendant in error, asked an officer of the bank, who was on the stand, this question: "Mr. Joseph, you don't buy those checks or drafts? It is not your understanding that you buy them?" And the answer was: "It is my understanding that we buy them with recourse on the depositor."

[8, 9] We are the more ready to construe the law of Alabama as being the same as the law of Virginia because that construction is in accord with the great weight of authority elsewhere, and with the sound policy of promoting efficiency and preserving uniformity in the application and operation of the negotiable instruments law.

The question of what is the law of another State is one of fact, but the interpretation of a foreign statute or judicial decision is a question of law. (10 R. C. L., sec. 319, p. 1113; *De Sobry* v. *De Laistre,* 2 Har. & J. (Md.), 191, 3 Am. Dec. 535.)   The case of *Bank* v. *Miller, supra,* cited by this court in *Bank* v. *Summers, supra,* throws light upon the proper interpretation of the Alabama law, and while we may not resort to that case as evidence, because it was not introduced at the trial, we may look to it as an authoritive repository of legal principles for our guidance in the interpretation of the decisions which were introduced in evidence.   That case, as already pointed out, is in line with the current of authority.

[10] On behalf of the defendant in error, stress is laid upon the fact that the bank officials testified that, in cases of this kind, they would always have recourse on the depositor if the drawee failed to pay the draft.   That is not only true in this case, under the practice of the Montgomery bank and its understanding with its customers, but it is true everywhere as a matter of law.   The existence and recognition of such a right does not in any way affect the title of the bank to the paper in question.   *Burton* v. *United States, supra; Ditch* v. *Western National Bank, supra;* Michie on Banks and Banking, *supra.*

[11] Nor do we attach any importance to the form of the endorsement placed upon the draft by the Montgomery bank before forwarding the same to its correspondents for collection.   That endorsement was as follows:   "The Fourth National Bank of Montgomery endorses this draft solely for the purposes of collecting it, and does not, in receiving payment or otherwise, guarantee the title, possession, delivery, quantity, quality or other condition of the goods mentioned in the attached bill of lading and will not be responsible in any way therefor."   This was a precautionary measure which the bank had the right to adopt

without affecting the contract between it and the depositor. As said by Mr. Justice Peckham in *Burton* v. *United States, supra,* "the forwarding of the check 'for collection,' as stated by Mr. Bruce, was not a collection for defendant by the bank as his agent. It was sent forward to be paid and the Riggs bank was its owner when sent." It is manifest that the Montgomery bank, forwarding this draft as its own property, wished to protect itself against any question that might arise as to the title, quantity, or quality of the goods. Such questions do arise in cases where the title of the forwarding bank to the draft itself is undisputed. See 4 Va. Law Reg. 391; *Brinkley & Co.* v. *Carlyle M. & G. Co.,* 6 Va. Law Reg. 776.

[12]     Under the law, as applied to the facts of this case, we are of opinion that the Montgomery bank is entitled to the proceeds of the draft in question, and that the evidence is such that no verdict or judgment to the contrary could be sustained. The facts are fully before the court, and there is no reason to suppose that upon another trial any new or different evidence might be introduced which ought to affect the result. Section 6365 of the Code of 1919, prescribes the following rule of decision in this court: "The appellate court shall affirm the judgment, decree or other order if there be no error therein, and reverse the same in whole or in part if erroneous, and enter such judgment, decree or order as to the court shall seem right and proper, and shall render final judgment upon the merits whenever in the opinion of the court the facts before it are such as to enable the court to attain the ends of justice. A civil case shall not be remanded for a trial *de novo* except where the ends of justice require it." In our opinion, the only proper result in this case is a judgment for the plaintiff in error, and pursuant to the section just quoted, we will enter here a final order to that effect.

*Reversed.*